IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SEAN SMITH, | § | CIVIL ACTION NO. 4:16-cv-01089 |
|     Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | |
| CHICAGO BRIDGE & IRON | § | |
| COMPANY, N.V., and | § | |
| BETH BAILEY, | § | |
|     Defendants. | § | JURY TRIAL DEMANDED |

PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Sean Smith ("Mr. Smith") files his Original Complaint against Defendants Chicago Bridge & Iron Company, N.V. ("CB&I," "CB&I, N.V.") and Beth Bailey ("Bailey") collectively "Defendants"), and for cause of action would respectfully show that:

I.
PRELIMINARY SUMMARY STATEMENT

1. Mr. Smith brings this civil action pursuant to the Sarbanes-Oxley Act of 2002, Corporate and Criminal Fraud Accountability Act, 18 U.S.C. §1514A, et seq. ("SOX") for discrimination and retaliation that occurred because he engaged in activity protected under SOX.

2. Mr. Smith, a well-respected 14-year employee with CB&I, engaged in protected activity when he complained to the Vice President of Internal Audit, Todd Freeman ("Freeman"), that there were major concerns with the Lutech Human Resources ("HR") processes that resulted in CB&I incorrectly billing intercompany accounts (and ultimately third-party companies) for the services of CB&I employees and incorrectly reporting payroll taxes to various States within the United States. Specifically, CB&I incorrectly billed for the services of Lutech employees. Lutech is a wholly owned subsidiary of CB&I (and part of Global Staffing

and Recruiting ("GSR")) that provides personnel on various projects for CB&I and its other subsidiaries.

3. Smith requested the company perform an Internal Audit on the problems he reported so they could be remedied and GSR could accurately and timely bill intercompany invoices and collect on the same. Smith believed these problems caused CB&I to misstate and misreport company finances to shareholders and also caused the company to incorrectly report and pay State payroll taxes in various States.

4. Smith further engaged in protected activity when he complained on April 22, 2015 to his direct supervisors, Chief Accounting Officer Wes Stockton ("Stockton"), and Vice President of GSR, Tom Anderson ("Anderson"), that the Final Internal Audit Report released that same day was fabricated (specifically, the "Management Action Plan" Nos. 1 and 2).

5. It was apparent to Smith when the Final Internal Audit Report was released that CB&I had no intention of remedying the serious accounting and tax issues he had reported. On April 23, 2015, Smith held a meeting with his Finance Team and instructed them that the Final Internal Audit Report was inaccurate and that they needed to continue to work on correcting the problems he requested the Audit to resolve.

6. On April 24, 2015, **two days after Smith reported the fabrications within the Final Internal Audit Report**, Smith was informed that his employment with CB&I was terminated after 14 years of service.

7. The temporal proximity between Smith's complaint regarding the results of the Internal Audit (that he had requested) and his termination clearly demonstrate that his complaints regarding company accounting practices were at least a contributing factor in his termination.

8. Smith lost his job because he refused to participate in CB&I's continued fraud on shareholders and third-party companies, incorrect intercompany accounting practices, tax provisions of various States and violations of Federal mail and wire fraud laws.

## II.
## PARTIES

9. Mr. Smith is an individual residing in Spring, Montgomery County, Texas, which is located in the Southern District of Texas, Houston Division.

10. Defendant CB&I is incorporated in the Netherlands, with its principal place of business at One CB&I Plaza, 2103 Research Forest Drive, The Woodlands, 77380 which is located in the Southern District of Texas, Houston Division.  CB&I can be served with process by delivering a copy of the Summons and Complaint to its registered agent for service of process, CT Corporation System at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

11. Defendant Bailey is an individual and Executive Vice President and Chief Administration Officer of Defendant CB&I.  Bailey may be served with process by delivering a copy of the Summons and Complaint to her at her office located at One CB&I Plaza, 2103 Research Forest Drive, The Woodlands, Texas 77380, or wherever else she may be found.

12. At all relevant times, CB&I has been a global engineering, procurement, and construction company specializing in lump-sum turnkey projects that produce, process, store and distribute various natural resources.  The company's stock is publicly traded on the New York Stock Exchange (NYSE: CBI).

## III.
## JURISDICTION AND VENUE

13. Jurisdiction is proper in this court pursuant to 28 U.S.C. §1131 (federal question jurisdiction) and 18 U.S.C. § 1514A (creating a private cause of action under SOX for employees

of publicly-traded companies who are retaliated against for engaging in certain protected activity).

14. Venue is proper in the Southern District of Texas, Houston Division, because Defendants' violations of SOX took place within this District; the impact of the violations on Mr. Smith occurred and will continue to occur in this District; and Mr. Smith resides in this District.

## IV.
## FACTS

### A. CB&I's Purchase of the Shaw Group, Inc. Leads To Billing Problems.

15. CB&I is an energy infrastructure company providing a wide range of services including, design, engineering, construction, fabrication, maintenance and environmental services to its customers.

16. Smith worked for CB&I for 14 years before his unlawful termination, receiving bonuses and promotions throughout his employment. As recently as approximately four months before his termination Smith received a raise and bonus. However, Smith's last raise was smaller than usual, which according to Stockton because Smith had "butted heads" with the HR group over Smith's complaints about the Lutech HR processes that resulted in CB&I incorrectly billing intercompany accounts (and ultimately third-party companies) for the services of CB&I employees and incorrectly reporting payroll taxes to various States within the United States. These were the problem Smith believed caused CB&I to misstate and misreport company finances to shareholders and also caused the company to incorrectly report and pay State payroll taxes in various States.

17. In February 2012, CB&I purchased Shaw Group, Inc. ("Shaw") for about $3 billion, expanding its nuclear building services in a portfolio of energy-related engineering and construction projects.

18. CB&I's GSR Division provides staffing, recruiting, assignment administration and employee mobilization services throughout the CB&I organization, as well as assists third-party companies with recruiting and staffing needs.

19. For the year ending December 31, 2014, GSR had total revenue of $510.3 million—**97% of GSR's revenue is intercompany revenue**.

20. After CB&I acquired Shaw and began the process of integration, Smith, as the Director of Finance and Business Administration for GSR, noticed serious issues within CB&I's Human Resources Information System ("HRIS"), which is managed and updated by CB&I's HR Division.

21. During Mr. Smith's employment the head of the HR Division was Bailey, CB&I's Chief Administrative Officer.

22. These issues included the lack of internal controls to ensure proper and supportable data for Lutech contractors, in addition to the fact that the HRIS system was unable to report accurate headcounts by CB&I Division.

23. Smith also noted that HRIS was unable to produce a report of current employees with correct pay and bill rates with their correct state of employment—this issue affected not only GSR, **but CB&I globally**.

24. Smith further noted that personnel files within HRIS were incomplete, lacking key employee information, and "Contractor Bill Rates" were inaccurate and/or inconsistent. As a result of these inaccuracies, **CB&I was incorrectly and fraudulently billing intercompany accounts (constituting 97% of GSR's revenue) and third-party companies by wire and mail.**

25. This prevented GSR from accurately and timely billing and collecting on invoices and **errors in GSR's (and by effect, CB&I's) revenue and gross profit numbers**.

B. **Billing Practices Could "Substantially" Affect CB&I Revenue And Profit.**

26. The incorrect billing of employee services to intercompany and third-party accounts has a direct impact on CB&I's ability to correctly report revenue and profit numbers. CB&I bills intercompany accounts and third-party companies under a combination of "cost-reimbursable" and "fixed-price" contracts. *Exhibit 1*.[1]

27. For example, CB&I explains in the "Risk Factors" Section of its 2014 Form 10-K that for cost-reimbursable contracts "[i]f [CB&I is] unable to obtain proper reimbursement for all costs incurred due to **improper estimates**, performance issues, customer disputes, **or any of the additional factors noted below for fixed-price contracts**, the project **may be less profitable than we expect**." *Id*.

28. The Form 10-K continues that one of the "factors" that can affect, "**sometimes substantially**," the revenue or gross profit for both cost-reimbursable and fixed-price contracts includes "**failure to properly estimate costs of…labor or subcontractors**."

29. Not only did the billing inaccuracies Smith reported cause CB&I to misstate revenue and gross profit numbers (as exemplified by the acknowledgment of the financial "risk" of misstating labor costs in CB&I's 2014 Form 10-K), but **it also caused CB&I to improperly report and withhold state payroll taxes in various States**.

30. For example, the HRIS might say an employee was located in the State of Pennsylvania or Louisiana, for which CB&I would collect and remit state payroll taxes, when in

---

[1] Exhibit 1 is a true and correct copy of an excerpt from CB&I's 2014 Form 10-K and incorporated by this reference.

fact the employee was not performing work in Pennsylvania or Louisiana, and was actually located in another State where payroll taxes were not being paid.

C.     **2014: Smith Complains About Billing and Data Problems.**

31.     Smith began complaining about these problems as they became evident to him in early 2014. In fall 2014, Smith formally reported these problems to Freeman and asked for an Internal Audit to help address and fix these problems. On several occasions beginning in the fall of 2014 Smith e-mailed Freeman saying he needed to speak with him. Smith was intentionally vague in his e-mails because CB&I has an unwritten rule that sensitive matters were not to be put in writing. This rule was created as a result of CB&I's 2005/06 SOX issues stemming from accounting irregularities. Freeman agreed to Smith's request for an Internal Audit and assured Smith that he would be protected because he had brought these issues forward.

32.     In or about December 2014/January 2015 Smith spoke with both Freeman and Stockton separately about his inability to properly close out GSR's 2014 financials and inability to properly reconcile GSR's 2015 financials going forward because of the billing inaccuracies Smith previously complained about. Smith was instructed to close out GSR's 2014 books as-is but was assured that the problems he faced with GSR's 2015 financials would be fixed going forward as a result the Internal Audit Smith requested.

D.     **Internal Audit As A Result Of Smith's Complaint.**

33.     As a result of Smith's complaint, CB&I began an Internal Audit focusing on the "operational, financial and compliance aspects within Global Staffing and Recruiting." (Quoting

***Exhibit 2***, which is a true and correct copy[2] of a preliminary draft of the Internal Audit Report and is incorporated by reference.)

34.     Multiple drafts of the Internal Audit Report were circulated during the Audit process, all of which Smith was able to review for progress and accuracy.  **Importantly, Bailey was also copied on these draft Reports, which were investigating the failures of her Division**.

35.     As the Audit continued and the complexity of the problems were fully appreciated, the draft Reports **continually** maintained that the new procedures or corrective measures aimed at fixing the problems Smith reported would be **"completed" or "fully implemented by end of second quarter 2015.**"  *Exhibit 2*.

36.     Smith felt this was a tough, but doable, timeline for resolving the issues he reported, which would allow his Finance Team to begin properly billing and accounting for employee services processed through GSR and collecting on outstanding invoices.

E.      **Final Internal Audit Report Completely Fabricated**.

37.     On April 22, 2015, just a few days after the previous draft had been circulated, the Final Internal Audit Report was released.  In its final form, and to Smith's complete shock, the Report claimed that the problems Smith complained about were now allegedly and suddenly "fixed."  (Quoting ***Exhibit 3***, which is a true and correct copy of the April 22, 2015 Final Internal Audit Report incorporated by reference.[3])

38.     According to "Management Action Plan" Nos. 1 and 2, **"100%" of the HRIS record were "reviewed…and corrected as necessary."**  *Id*.

---

[2] The date on page 1 of the Report auto populates based on the date the document is printed.  Thus, while the date on Exhibit 2 says "April 29, 2015," the draft was truly released *earlier* than April 29, 2014 (further evidenced by the fact that the Final Internal Audit Report was released on April 22, 2015).
[3] Exhibit 3 is the Final Internal Audit Report that was released on April 22, 2015, which is correctly noted on page 1 of the Report.

*Plaintiff's Original Complaint*                                                                                                                   8

39. Further, a number of issues that had previously been discussed and examined in the "Summary of Results" and "Observations" sections of the draft Report(s) were completely removed from the final Report and not discussed at all. *Compare* **Exhibit 2** *and* **Exhibit 3**.

40. For example, three topics removed from the Final Report that were in the draft Reports are: (1) "Pay changes for contractors were not approved or entered into the HRIS in a timely manner;" (2) "Missing or documentation approval for terminated contractors;" and (3) "Hypothetical tax calculation was not available." **Exhibit 2**.

41. As Smith's Finance Team was directly and continually working with Bailey's HR "Task Force" to implement corrections to the problems Smith reported up until, and after, the Final Internal Audit Report was issued, Smith was well aware that these problems in fact had not been remedied.

42. Upon information and belief, Bailey ordered the "Management Action Plans" within the Final Report to be changed to show that all of the problems implicating faults in her Division had been completely resolved despite the fact that the last draft of the Report clearly stated that the identified problems would not be corrected until the end of second quarter 2015.

**F.     Smith Complains About Fabrications In The Final Report.**

43. As the statements within the Final Report were completely inaccurate, Smith immediately complained to his direct supervisor (Stockton) and his "dotted line" supervisor (Anderson) the same day the Report was released.

44. Smith informed Stockton and Anderson that the Final Internal Audit Report, as it related to the issues he complained about ("Observation" Nos. 1 and 2), were complete fabrications and that CB&I still had major issues that needed to be fixed. **Anderson directly reports to Bailey**.

45. Stockton agreed with Smith that the GSR Finance Team needed to continue working to fix these problems by the original end of second quarter deadline, and not pretend that the problems were fixed.

46. Because Smith was concerned that CB&I had no intention of fixing the large scale accounting and tax problems it faced, the next day (April 23) he informed his Finance Team that the Internal Audit Report, specifically Management Action Plan Nos. 1 and 2, were not "fixed" and instructed them to continue working on corrective measures related to the proper billing for GSR's services.

47. Smith was extremely concerned that CB&I needed to face the problems he had reported and not simply sweep them under the rug as he believed the issues directly impacted the company's ability to properly report its finances to shareholders and the proper payment of State payroll taxes.

48. In addition, if the problems were not remedied, CB&I would continue sending unsupportable and fraudulent invoices to intercompany accounts and, ultimately, third-party customers.

## G.  Example Of Unresolved Problems That Were Allegedly "Fixed."

49. The day after the Final Internal Audit Report was released, Michael Kingsley ("Kingsley"), an employee for "CB&I/Lutech Resources Payroll Department," sent Smith an e-mail that further confirmed what he already knew: **the problems the Report alleged were completely "fixed" within Management Action Plan Nos. 1 and 2 were in no way fixed**. (Quoting *Exhibit 4*, a true and correct copy of the e-mail which is incorporated by reference.)

50. Kingsley's e-mail attached a lengthy Excel spreadsheet showing *numerous* individuals that were "current (*sic*) active" on Lutech's employee roster but had not worked in

weeks, or in some instances, months or years and needed to be "terminated or moved" from the list. *See Exhibit 5*, a true and correct copy of an excerpt of the Excel spreadsheet which is incorporated by reference (the date in the far left hand column is the last date work was performed by each individual listed).

51. One "Observation" the Final Internal Audit Report addressed was this very issue of Lutech "employees" listed within HRIS as "active employees…but did not have time reported in 2014." *See Exhibit 3*. This error resulted in "payments" being made to "terminated contractors."[4] *Id*. The Management Action Plan on this point (that was drafted at Bailey's direction) states "**Fixed: All non-active employees have been terminated in the system.**" *Id*.

52. Kingsley's e-mail to Smith clearly shows that despite the Final Internal Audit Report's conclusion issued the day before stating, "**Fixed: All non-active employees have been terminated in the system,**" the problem of ex-employees still showing as current, active employees (and **possibly still getting compensated for work they didn't perform**) **still** existed within CB&I and Lutech on April 23, 2015.

H. **Smith Is Terminated For Complaining.**

53. On April 24, 2015, **two days** **after Smith complained to Stockton and Anderson**, and **one day** **after Smith instructed his Finance Team to continue to support the Task Force in correcting the data problems that were creating the billing errors** Smith initially complained about, **Smith was terminated from CB&I after 14 years of employment**.

54. Smith was terminated <u>not</u> by Stockton, but by Steve Dimlich ("Dimlich") (Vice President of Corporate Human Resources) and Steve Glenn ("Glenn") (Director of Corporate Human Resources). In fact, **neither Stockton nor the newly appointed CFO, Michael Taff**

---

[4] Another example of waste occasioned by the issues Smith reported was an employee who was paid his "per diem" for 6 to 8 months when he was actually at home and not deployed—the employee received over $10,000 in (un-taxed) "per-diem" compensation.

*Plaintiff's Original Complaint* 11

**("Taff"), were consulted at all regarding Smith's termination**. On the day of Smith's termination, **Bailey informed Stockton and Taff that Smith was being let go**.

55. Stockton argued with Bailey that the termination of one of his direct reports was not her decision to make, and instead should be a Finance decision. Stockton further stated that based on the results of the Internal Audit, Smith's termination was not warranted.

56. Bailey informed Stockton that regardless of his comments, the decision had been made. She further instructed Stockton that he was not to communicate with Smith, nor would he be allowed in the termination meeting.

57. In his termination meeting, Smith was told he was being let go **"because of the Internal Audit."** Smith informed Dimlich and Glenn during this meeting that the Final Internal Audit Report, specifically Management Action Plan Nos. 1 and 2, were a complete fabrication and that the company still had serious problems that needed to be addressed as they were incorrectly billing intercompany accounts (and ultimately third-party companies) by sending both under and over inflated invoices, as well as improperly reporting payroll taxes to various States.

58. Dimlich thanked Smith for this information but, **despite complaining for the third time about CB&I's fraudulent practices during this meeting, Dimlich and Glenn maintained that Smith's employment was terminated. Smith's company cell phone and laptop were taken and he was immediately escorted off CB&I's premises.**

I.  **CB&I Frantically Trying To Fix Issues Since Smith's Termination.**

59. Since Smith's termination, CB&I has been frantically working to fix the problems that were allegedly already completely fixed on April 22.

60. On or about May 21 or 22, despite knowledge throughout the upper ranks of CB&I that Smith had repeatedly complained before his termination that the Final Audit Report contained patently false statements, President and CEO Philip Asherman ("Asherman") presented the Final Audit Report to the Board of Directors and represented that all of the problems identified by the Report were in fact fixed.

61. Bailey was present at this presentation with Asherman. Despite her knowledge that the problems addressed in Observation Nos. 1 and 2 had not been corrected and that the Management Action Plan Nos. 1 and 2 were complete fabrications, she sat by silently during Asherman's presentation.

62. On June 2, 2015, CB&I, Asherman and Bailey were provided notice of Smith's complaints under SOX. Since receiving notice of Smith's complaints, Bailey has been frantically directing CB&I employees to work around the clock to fix the problems identified in Observation Nos. 1 and 2, despite the prior representations that these problems were completely "fixed."

63. Bailey has gone so far as to threaten at least five employees with termination if the allegedly previously fixed problem were not actually corrected by June 19.

64. CB&I and Bailey are well aware that the problems Smith complained about regarding incorrect billings in early 2014 are still a problem for CB&I—despite their efforts to cover up these issues with the publication of a falsified Internal Audit Report (specifically, Management Action Plan Nos. 1 and 2) on April 22.

65. On June 4, 2015 Taff and Patrick Mullen (Executive Vice President and President of CB&I's Engineering & Construction Group) presented to investors at the Credit Suisse 2015 Engineering & Construction Conference, and that same day filed their From 8-K with the SEC.

66. Despite the knowledge CB&I has regarding Smith's complaints related to fraudulent billing practices at CB&I and the related impact on revenue and profits, both Taff and Mullen's presentation and CB&I's Form 8-K provide positive financial outlooks and encourage investment.

**J.    Exhaustion of Administrative Remedies.**

67. On June 18, 2015, Mr. Smith timely filed a formal Complaint with the United States Department of Labor, OSHA division, against CB&I under SOX for the discrimination and retaliation that occurred because he engaged in protected activity.

68. On March 22, 2016, Mr. Smith gave OSHA notice, in accordance with 29 C.F.R. §1980.114, of his intent to file an action in federal court under SOX because the 180-day period for OSHA to process his administrative complaint had expired.

69. On March 23, 2016, OSHA provided notice that it was dismissing Mr. Smith's administrative complaint based on the expiration of the agency's 180-day period to process the administrative complaint. A true and correct copy of OSHA's March 23, 2016 letter is attached as *Exhibit 6* and incorporated by reference.

## V.
## VIOLATIONS OF SOX

70. Plaintiff incorporates the preceding paragraphs of this Complaint as if stated fully within.

71. Section 806 of SOX, codified at 18 U.S.C. §1514A, creates a private cause of action for employees of publicly-traded companies who are retaliated against for engaging in certain protected activity. More specifically, SOX provides that no publicly-traded company "may **discharge, demote, suspend, threaten, harass, or in any other manner discriminate** against an employee in the terms and conditions of employment because of any lawful act done

by the employee (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the **employee reasonably believes constitutes a violation of** [mail fraud, wire fraud, bank fraud, securities fraud], **any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders**, when the information or assistance is provided to or the investigation is conducted by . . . (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discovery, or terminate misconduct)." 18 U.S.C. §1514A(a)(1)(C) (emphasis added).

72. CB&I employed Mr. Smith and each of the persons who took adverse employment action against him.

73. Smith engaged in protected activity. The accounting problems Smith identified and properly reported to Management and Internal Audit directly impact CB&I's ability to properly bill accounts internally (and ultimately externally). This in turn affects CB&I's ability to properly report revenue and profits to shareholders and the proper payment of State payroll taxes. The means by which CB&I goes about to continue this fraud on shareholders, clients and individual States constitute a violation of Federal mail and wire fraud laws.

74. Smith complained about these issues on numerous occasions. Instead of attempting to rectify these problems, CB&I issued patently false conclusions (specifically, "Management Action Plan" Nos. 1 and 2) in a Final Internal Audit Report that was subsequently issued to its Board of Directors.

75. When Smith complained about CB&I's continued fraudulent conduct after the release of the Final Internal Audit Report and CB&I's apparent intention to continue its fraudulent practices Smith was swiftly terminated.

76. Smith's protected activity was at least a contributing factor in these unfavorable personnel actions.

77. As a result of CB&I's conduct, Smith has and will sustain substantial economic damages, which include, but are not limited to, loss of wages and employee benefits in the past and future and lost earning capacity.

78. As a result of CB&I's conduct, Mr. Smith has also suffered and will continue to suffer severe and substantial humiliation, mental anguish and emotional distress in the past and future.

79. In addition, because CB&I's conduct was intentional, malicious and/or grossly negligent, Mr. Smith is entitled to recover punitive/exemplary damages from Defendants in an amount to be determined by the jury.

80. CB&I's wrongful conduct has made it necessary for Mr. Smith to retain the undersigned attorneys to represent him in bringing and prosecuting this action, and, if necessary, for legal representation on appeal. Mr. Smith therefore seeks recovery of all reasonable attorneys' fees and costs pursuant to SOX.

## VI.
## CONDITIONS PRECEDENT

81. All conditions precedent to bringing this suit have occurred or been satisfied.

## VII.
## JURY DEMAND

82. Plaintiff demands a trial by jury.

## VIII.
## PRAYER

83. WHEREFORE, Plaintiff respectfully requests that the Court enter Judgment against Defendants under SOX for damages for violating SOX, punitive damages, reasonable

and necessary attorneys' fees in the trial court and all subsequent appeals, costs of court, pre- and post-judgment interest at the maximum lawful rate, and all other relief to which he may be entitled.

        Respectfully submitted,

        */Michael A. Starzyk/*
        **Michael A. Starzyk**
        TBA # 00788461
        Southern District of Texas Bar No.16926
        **Megan M. Mitchell**
        TBA # 24073504
        Southern District of Texas Bar No. 2174572
        **STARZYK & ASSOCIATES, P.C.**
        10200 Grogan's Mill Road
        Suite 300
        The Woodlands, Texas 77380
        T: [281] 364-7261
        F: [281] 364-7533

        **ATTORNEYS FOR PLAINTIFF,**
        **SEAN SMITH**