UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SEAN SMITH, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:16-CV-1089 |
| | § | |
| CHICAGO BRIDGE & IRON COMPANY, | § | |
| N.V., *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM & ORDER

Pending before the Court are Motions for Summary Judgment filed by Defendants Chicago Bridge & Iron Company, N.V. and Beth Bailey. (Doc. Nos. 31 & 32.) A hearing was held upon the matters on June 5, 2017. Upon consideration of the parties' arguments, and the relevant statutes and caselaw, the Court holds that it must deny summary judgment for CB&I, and grant summary judgment for Bailey.

I. BACKGROUND

Chicago Bridge & Iron Company, N.V. ("CB&I") provides technology, engineering, and construction services in the energy industry. (Doc. No. 34-1 at 14.) CB&I has its own in-house staffing division, Global Staffing and Recruiting (GSR), which procures employees and contract workers to meet CB&I's staffing needs. (Doc. No. 33-2 at 5.) In 2011, Plaintiff Sean Smith, who was working in the Treasury Department of CB&I's Finance Department, accepted the position of Director of Finance and Business Administration of GSR. (Doc. No. 34-1 at 14.) Smith is a licensed CPA, and had previously worked as an external auditor at Arthur Anderson. In his new role at GSR, Smith worked closely with Human Resources ("HR"), and was in charge of billing CB&I divisions for the employees provided by GSR. (Doc. No. 33-2 at 5.) Smith reported

directly to Wesley Stockton, the Vice President and Chief Accounting Officer of GSR. Stockton reported to Michael Taff, the Chief Financial Officer of GSR, who started in that role on April 1, 2015. (*Id.* at 4.) Smith also had a "dotted" reporting line to Thomas Anderson, who reported to Beth Bailey, the Executive Vice President and CAO of CB&I. (*Id.*) This meant that, although Anderson was not Smith's direct supervisor, Smith and Anderson often worked closely together. (*Id.*) Beth Bailey is the only individual named as a defendant in this case.

CB&I claims that, in 2013, Anderson began to notice performance deficiencies in Smith's work. (*Id.*) In early 2014, Anderson told Stockton (Smith's direct supervisor) that Smith needed to be replaced. (*Id.* at 6.) Stockton agreed and said he would look for a replacement, but that did not happen quickly. (*Id.*) Around the same time, Smith also approached Stockton, stating that he wanted to move out of GSR. (Doc. No. 34-1 at 33.) Before April of 2015, it appeared as though Smith would move back to the Treasury Department in CB&I. (Doc. No. 33-2. at 7.) He even interviewed replacements for his position in GSR. (*Id.*)

However, at the beginning of 2015, the Internal Audit Department of CB&I began conducting an audit of GSR. (*Id.* at 4.) According to Defendants, these audits are routine, with 80-100 being conducted within CB&I each year. In April 2015, the final audit report detailed errors in GSR's Finance Department (which Smith ran) and HR Department that created internal billing failures. (Doc. No. 33-2 at 7.) As a result of this audit, Taff, the CFO of GSR, decided to terminate Smith, instead of transferring him. He says that the audit revealed "fundamental problems in Smith's Finance department that were unrelated to GSR HR systems mistakes." (Doc. Nos. 32-1 at 13; 33-2 at 116.) As a result, Taff did not think it was appropriate to transfer Smith to another division, and decided instead to terminate him. (Doc. No. 33-2 at 116.) In addition to Smith, the head of HR and five other individuals in HR were terminated, all on the

same day. (Doc. No. 33-2 at 10.)

Smith presents evidence, however, that he had *requested* the very audit that was then used as a basis to terminate him. He states that in November 2014, he complained to Anderson about concerns he had with GSR's ability to produce accurate billings "and the ramifications on CB&I as a whole." (Doc. Nos. 34 at 4; 34-1 at 85.) Smith contends that errors in inputting the proper pay rates for employees, which was the HR Department's responsibility, made it impossible for the Finance Department to produce an accurate bill. Smith states that, when nothing changed after complaining to Anderson, he went to Todd Freeman, the head of Internal Audit at CB&I, and asked for an audit. (Doc. No. 34-1 at 32.) Freeman does not deny this, but states that he had also conducted a routine survey of the top executives at CB&I to determine which departments should be audited. (Doc. No. 33-2 at 39-40.) According to these surveys, GSR was ranked first, which is why it was audited—not because of Smith's complaints. (Doc. No. 33-2 at 40.)

Once the initial audit reports came out, Beth Bailey, who oversaw the HR Department, assigned someone to help fix the problems stemming from the HR Department. (Doc. No. 33-2 at 18.) A few weeks later, she sent around "Management Action Plans" with responses to the problems identified in the audit, indicating that the problems had all been "fixed" and detailing that process. (*Id.* at 19.) Smith apparently complained to his team, Stockton, and Anderson that these responses were fabricated, and that the problems exposed in the audit persisted. (Doc. No. 34-1 at 173, 323.) He argues that his termination was the result of his requesting the audit and complaining about the allegedly fabricated "fixes" from HR. (Doc. No. 34 at 18.) His termination occurred two days after the final audit report was released, and one day after he complained about the "fixes." (*Id.*)

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence presented. Fed.R.Civ.P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett,* 247 F.3d 206, 210 (5th Cir.2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.,* 234 F.3d 899, 902 (5th Cir.2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g., Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996), *McIntosh v. Partridge,* 540 F.3d 315, 322 (5th Cir.2008); *see also Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts' ") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. SARBANES-OXLEY ACT

Section 806 of the Sarbanes–Oxley Act ("SOX") creates a private cause of action for employees of publicly-traded companies that are retaliated against for engaging in protected activity. 18 U.S.C. § 1514A. The statute states, in relevant part:

> No [publicly-traded company] . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee (1) to provide information, cause information to be provided, or otherwise assist in an

4

> investigation regarding any conduct which the employee reasonably believes constitutes a violation of [18 U.S.C] section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct) . . . .

18 U.S.C. § 1514A(a)(1)(C). In order to establish a claim, an employee must prove by a preponderance of the evidence (1) that he engaged in protected activity; (2) his employer knew he engaged in that activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. *Allen v. Administrative Review Bd.*, 514 F.3d 468 (5th Cir.2008) (*citing Collins v. Beazer Homes USA, Inc.*, 334 F.Supp.2d 1365, 1379 (N.D.Ga.2004)). If the employee establishes these four elements, the employer may still avoid liability by proving, by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of the protected behavior. *Id.*

Smith alleges that he engaged in protected activity by requesting the audit in the first place, and by subsequently complaining about the allegedly fabricated "fixes" from HR. Defendant Bailey argues that she had no knowledge of Smith's alleged protected activity, and that, even if she did, she did not make the decision to terminate Smith. (Doc. No. 31-1 at 4-5.) Defendant CB&I argues that Smith did not engage in protected activity, that Taff, who made the decision to terminate Plaintiff, did not know of Smith's alleged protected activity, and that accordingly, the decision was not causally related to Plaintiff's activity. (Doc. No. 32-1 at 6.) Finally, CB&I states that, even if Plaintiff could make out a prima facie case against it, CB&I would have terminated Smith in the absence of protected activity. (*Id.*)

### A. Whether Smith Engaged in Protected Activity

Protected activity under SOX is defined as

> any lawful act done by the employee to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders . . . .

An employee's reasonable belief that conduct violates one of those six categories must be evaluated under both an objective and a subjective standard. *Allen*, 514 F.3d at 477. Subjective reasonableness requires that the employee "actually believed the conduct complained of constituted a violation of pertinent law." *Welch v. Chao*, 536 F.3d 269, 277 n. 4 (4th Cir. 2008). The objective standard examines whether the belief would be held by "a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Allen*, 514 F.3d at 477. "Importantly, an employee's reasonable but mistaken belief that an employer engaged in conduct that constitutes a violation of one of the six enumerated categories is protected." *Id.* The "objective reasonableness" standard applicable to SOX whistleblower claims is similar to the "objective reasonableness" standard applicable to Title VII retaliation claims. *Id.* In Title VII retaliation cases, the objective reasonableness of an employee's belief can be decided as a matter of law in some cases. *Id.* However, if reasonable minds could disagree on this issue, the objective reasonableness of an employee's belief should not be decided as a matter of law, and the fact-finder's resolution of the issue is entitled to deference on appeal. *Id.*

There exists a question of fact as to whether Smith subjectively believed that there was a SOX violation. CB&I characterizes Smith's activity as telling his supervisors that he was "having trouble billing" and telling his supervisors that "work remained to be done" regarding the "fixes" made by the HR department in response to the initial audit report. (Doc. No. 32-1 at 18.) But Mark Truchan, the former General Manager for GSR, testifies that Smith told Anderson, "I can't keep billing. I've got to stop. There's a SOX issue here. We can't bill something we

6

know is incorrect," among other statements alluding fraudulent billing. (Doc. No. 34-6 at 19.) Thus, there is question of fact regarding Smith's subjective belief that there was a SOX violation.

Defendant CB&I insists that Smith can adduce no evidence demonstrating that he reasonably believed that CB&I's conduct constituted fraud. (Doc. No. 32-1 at 20.) Smith responds by showing that, although the bills generated by GSR initially went to intercompany partners, they were ultimately billed to third-party CB&I customers, thus creating a potential impact on CB&I's reporting to shareholders. (Doc. Nos. 34-2 at 26; 34-2 at 24.) Furthermore, Smith points to a risk assessment conducted by CB&I's Internal Audit department that ranked GSR as the highest risk for CB&I as a whole going into 2015, as it relates to "ethics, fraud, illegal acts and theft." Doc. No. 34-4 at 17.) Although CB&I claims that this was the result of two events unrelated to the billing activity Smith complained of, it is certainly plausible that Internal Audit was also considering the billing problems when making the risk assessment.

Additionally, Smith marshals evidence from other employees at GSR and CB&I to demonstrate the reasonableness of his belief. Specifically, Mark Truchan, the former General Manager for GSR, testified that he believed the billing issues implicated SOX. (Doc. No. 34-6 at 9, "There's laws that govern this, Sarbanes-Oxley and various laws that you can't willfully bill something you know to be incorrect.") CB&I's former Chief Financial Officer also testified that the billing errors complained of by Smith could affect the numbers of CB&I as a whole. (Doc. No. 34-2 at 24.) CB&I's Chief Accounting Officer, Wesley Stockton, stated that the billing problems Smith complained of "could become material over time." (Doc. No. 34-3 at 46.)

Smith does not need to prove that there was, in fact, a SOX violation in order to show that his belief was reasonable. *Allen*, 514 F.3d at 477 ("Importantly, an employee's reasonable but mistaken belief that an employer engaged in conduct that constitutes a violation of one of the

six enumerated categories is protected."). Smith is a licensed CPA, and had previously worked as an external auditor for Arthur Anderson. As such, he has familiarity with SOX, and with the potential legal impact of billing errors. He has adduced evidence that GSR was consistently billing projects incorrectly, which led to billing third-party clients incorrectly. Further, he has shown that he reported these billing inaccuracies to his supervisors, but that the problems did not stop. Finally, he has shown that other CB&I employees were concerned that the billing issues could implicate SOX. The Court finds that a reasonable jury could find that Smith's subjective belief was objectively reasonable, and that he engaged in protected activity for the purposes of SOX.

### B. Whether Bailey and CB&I Knew that He Engaged in Protected Activity

Both Defendants assert that no reasonable jury could find that they knew about Smith's protected activity. (Doc. Nos. 31-1 at 4-5; 32-1 at 7.) Although Smith presents no direct evidence that Bailey and Taff were aware of his protected activity, he procures sufficient circumstantial evidence to preclude the Court from granting summary judgment on this issue. It is uncontroverted that Anderson, Stockton, and Freeman knew about Smith's protected activity. (Doc. Nos. 34-4 at 8-9; 34-3 at 44.) Thus, in order to avoid summary judgment, Smith needs to create a fact question about whether one of those individuals told Bailey or Taff about Smith's protected activity.

Retaliation cases must often be proven with "the cumulative weight of circumstantial evidence, since an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir.2000); see also *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 83 (2d Cir.2005) (observing in a Title VII case that "'[k]nowledge' is a fact often

established—even in criminal cases where the prosecution's burden is beyond a reasonable doubt—simply through circumstantial evidence" (citations omitted)).

Defendants argue that circumstantial evidence of knowledge is not enough to preclude summary judgment. (Doc. No. 48 at 7.) They rely on *Leshinsky v. Telvent GIT* for this proposition. 942 F. Supp. 2d 432, 451 (S.D.N.Y. 2013) The court in *Leshinsky* granted summary judgment for a supervisor, finding that "with regard to the causation prong of the prima facie standard, '[a]bsent any evidence to support an inference that [the decisionmakers] knew of [p]laintiff[']s [protected activity], [p]laintiff cannot rely on circumstantial evidence of knowledge as evidence of causation.'" *Id.* (*citing Murray v. Visiting Nurse Servs. of N.Y.*, 528 F.Supp.2d 257 (S.D.N.Y.2007) (collecting cases)). First, the court in *Leshinsky* was discussing the causation prong of a SOX claim, while the Court here is considering the knowledge requirement. Furthermore, unlike the plaintiff in *Leshinsky*, Smith does procure evidence supporting an inference that Bailey and Taff knew of his protected activity. Thus, the holding of *Leshinsky* is not relevant.

With regard to Bailey's knowledge, Smith shows that Anderson began approaching Bailey—even though Smith was not in Bailey's reporting chain—about replacing Smith around the same time that Smith started complaining about the billing issues. (Doc. Nos. 34-6 at 14-15 & 17; 34-8 at 7, 10.) He also presents evidence that Anderson said to Bailey, in a meeting held during the audit, that "it's that damn finance guy [Smith] that is blowing it." (Doc. No. 34-1 at 92-93.) Furthermore, Bailey swears, in her declaration, that she was not aware of Smith's complaints after the audit report was released, or of Smith's belief that GSR's conduct was in violation of any specific law. However, Bailey never declares that she was unaware that Smith

9

requested the audit of GSR.[1] (Doc. No. 33-2 at 21.) This evidence, taken together, indicates that Anderson may have informed Bailey that Smith had requested an audit of GSR. Thus, the Court cannot conclude, as a matter of law, that no reasonable jury could find that Bailey knew of Smith's protected activity.

Smith also shows that, after Taff started as the CFO of GSR on April 1, Bailey sought out Taff on multiple occasions specifically in order to discuss Smith, and to express her unhappiness with his performance. (Doc. Nos. 34-7 at 23; 34-8 at 3.) Taff recalls that, while Bailey was not happy with Smith's work, she did not complain about anyone in her own department. (Doc. No. 34-7 at 23.) This, despite Smith not being in Bailey's reporting line, and despite Stockton, Smith's direct supervisor, informing Bailey that Smith's work had been negatively affected by HR's billing problems. (Doc. Nos. 34-8 at 30; 33-2 at 15-16.) Like Bailey, Taff states in his declaration that he was not aware of Smith's belief that GSR was violating SOX or any other law. (Doc. No. 33-2 at 116-117.) However, he does not state that he was unaware that Smith requested the audit. (*Id.*) Thus, Smith has presented circumstantial evidence that Bailey informed Taff of Smith's protected activity. As such, a jury must decide whether Taff, on behalf of CB&I, knew of Smith's activity.

### C. Whether Smith Suffered an Unfavorable Employment Action

There is no dispute that Smith suffered an unfavorable employment action when he was terminated from his position at GSR.

### D. Whether the Protected Action was a Contributing Factor to the Unfavorable Employment Action

In order to avoid summary judgment, Smith must also demonstrate a material question of

---

[1] Defendants argue that Smith's request of the audit was not protected activity, and that he never stated that Defendants were violating SOX. Thus, it is possible that Defendants knew he requested the audit, but simply construe this as activity that is not protected under SOX.

fact as to whether his protected activities were a contributing factor to his termination. A contributing factor is "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Allen*, 514 F.3d at 476 (citing *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, ARB Case No. 04–149, 2006 WL 3246904, at *13 (ARB May 31, 2006). This lenient causation standard is "less onerous than the showing required under Title VII, the ADEA, or USERRA." *Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1137 (10th Cir. 2013).

Several pieces of evidence support Smith's contention that his protected activity was a contributing factor to the termination. First, Smith points out that he received positive performance evaluations in January and February, 2015, even receiving a "good incentive compensation review award." (Doc. No. 34-3 at 18-19.) CB&I counters that Taff fired Smith because of the results of the internal audit, which were revealed after Smith received his positive evaluations. (Doc. No. 33-2 at 116.) But Smith points to the testimony of Stockton, Smith's direct supervisor, who stated that he would not have terminated Smith for his performance or for the results of the audit. (Doc. No. 34-3 at 27.) Freeman, the head of CB&I's Internal Audit division, also testified that he did not believe the issues in the audit report merited Smith's termination, and that he was surprised when he heard of Smith's termination. (Doc. No. 34-4 at 39.) Stockton and Freeman's statements gain relevance because CB&I argues that Taff made the decision to terminate Smith based on conversations with Bailey, Stockton, and Freeman. Thus, because Stockton and Freeman testify that they did not recommend, and would not have recommended, that Taff terminate Smith, Bailey's role in Smith's termination is elevated. Smith also argues that Bailey had a motive to retaliate against him, because Smith requested the audit that brought to light large-scale problems in HR—the department Bailey managed—and because

Smith subsequently stated that the "fixes" put into place by Bailey had been fabricated. (Doc. No. 34 at 22.)

According to Smith, Bailey's role in Taff's decision to terminate him is relevant because of the subordinate bias, or "cat's paw" theory of liability. This theory dictates that "[w]hen a decision to fire is made with no unlawful animus on the part of the firing agent, but partly on the basis of a report prompted (unbeknownst to that agent) by discrimination, discrimination might perhaps be called a 'factor' or a 'causal factor' in the decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 418–19 (2011). The Supreme Court found that this was a viable theory of causation in cases alleging violations of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). *Id.*

The Fifth Circuit has not yet addressed whether the cat's paw theory is applicable to SOX cases. But the Fifth Circuit has allowed it in a Title VII case, which has a heightened but-for causation standard. *Zamora v. City Of Houston*, 798 F.3d 326, 332 (5th Cir. 2015); see also *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998) (holding that, in an ADA and ADEA case, "[a] causal link can be established by evidence that the ultimate decision maker, with final authority to hire and fire subordinate employees, merely 'rubber stamped' a recommendation to terminate made by an employee with knowledge of the complaint.")

The Tenth Circuit has considered directly whether the cat's paw theory may be applied in a SOX case, and found that it could. *Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1137 (10th Cir. 2013). The Tenth Circuit reasoned that "the required showing to establish causation for a claimant under [the Sarbanes-Oxley Act] is less onerous than the showing required under . . . USERRA." Thus, if the cat's paw theory of causation sufficed for the purposes of USERRA, it would suffice for the lower causation requirement in

SOX. The Court agrees with this reasoning, and holds that Smith may show causation through the "cat's paw" theory of liability. Accordingly, Bailey's actions are relevant in considering CB&I's liability, even if Taff did not have any unlawful animus in firing Smith.

Considering all of the evidence put forth by Smith, and in light of the cat's paw theory, the Court finds that Smith has raised a genuine issue of fact regarding CB&I's motivations in firing him.

Bailey asserts that she must be dismissed from the action because she was not Smith's direct supervisor, nor was she in a position to fire Smith. (Doc. No. 31-1 at 5.) Both Bailey and Taff unequivocally testify that Taff fired Smith, not Bailey. (Doc. No. 33-2 at 15, 116.) Furthermore, it is undisputed that Smith did not report to Bailey, nor was he in Bailey's reporting line. (Doc. No. 33-2 at 15.) Although Bailey had discussions with Taff about Smith's performance, and may have influenced Taff's decision, she did not have the authority to fire Smith herself. This would seem to indicate, then, that Bailey cannot be held liable for Smith's termination.

However, Smith claims that Bailey can be held liable using the cat's paw theory. (Doc. No. 36 at 8.) Smith is mistaken. Although the cat's paw theory allows the Court to consider the actions of a subordinate employee when analyzing the liability of the employer, it does not allow the Court to hold that subordinate employee liable. Indeed, all of the cases using the cat's paw theory have done so to hold an employer liable, not an individual employee. *See, e.g., Zamora v. City Of Houston*, 798 F.3d at 329 (police officer suing the City of Houston); *Sherrod v. Am. Airlines, Inc.*, 132 F.3d at 1115 (employee suing American Airlines, Inc.); *Lockheed Martin*, 717 F.3d at 1126 (employee suing Lockheed Martin Corp). Here, Bailey did not have the power to terminate Smith, and as such she cannot be held liable for his termination. Bailey's motion for

13

summary judgment must be granted.

### E. Whether Bailey and CB&I Would Have Taken the Unfavorable Employment Action in the Absence of the Protected Behavior

Because Smith has established a *prima facie* case against CB&I, summary judgment is warranted only if Defendant can demonstrate that, as a matter of law, there is "clear and convincing" evidence that Plaintiff would have suffered the same unfavorable action even in the absence of the retaliatory factor. *Leshinsky v. Telvent GIT*, S.A., 942 F. Supp. 2d 432, 451 (S.D.N.Y. 2013). "This standard is even more stringent than the already 'tough standard' that employers face in other employment discrimination cases." *Mahony v. KeySpan Corp.*, No. 04 CV 554 SJ, 2007 WL 805813, at *7 (E.D.N.Y. Mar. 12, 2007).

CB&I maintains that it would have fired Smith even in the absence of his protected activity. CB&I asserts that Smith's performance deficiencies began long before his protected activity, citing to Anderson's testimony that he noticed fundamental problems in Smith's performance as early as 2013. (Doc. No. 32-1 at 26.) Although Smith's supervisors had originally planned for Smith to transfer to another department, CB&I argues that once Taff saw the results of the audit report, he decided that Smith needed to be terminated instead of transferred. (Doc. No. 33-2 at 116.)

But Smith has adduced evidence that he was not to blame for the problems revealed in the audit report, because he was unable to bill accurately when HR was not correctly inputting billing data. (Doc. No. 34-3 at 29.) This is consistent with his requesting the audit in the first place. Smith has also presented testimony of his direct supervisor and the head of Internal Audit, both of whom were surprised at the decision to terminate Smith, even in light of the results of the audit. (Doc. Nos. 34-3 at 14; 34-4 at 39.) Thus, CB&I's assertion that Smith's termination was justified solely because of the audit report does not carry the weight necessary to overcome the

clear and convincing evidence standard at the summary judgment stage. As a result, this Court will to defer to a jury's judgment whether CB&I establishes by clear and convincing evidence that Smith's termination was non-retaliatory.

## IV.     CONCLUSION

For the foregoing reasons, CB&I's Motion for Summary Judgment is hereby **DENIED**, and Beth Bailey's Motion for Summary Judgment is hereby **GRANTED**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 16th day of June, 2017.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE